OPINION
Defendant-appellant, Jerry Wayne Howard, appeals his conviction in the Warren County Court of Common Pleas for murder.
Appellant was indicted in November 1980 on one count of murder in violation of R.C. 2903.02(A). The charge stemmed from an incident that occurred in the early morning hours of October 7, 1980, wherein appellant allegedly fatally stabbed Allen[1] Powell with a knife. Appellant pled not guilty, and not guilty by reason of insanity. On June 5, 1981, a jury found appellant guilty of murder. Following appellant's appeal of his murder conviction, this court reversed his conviction and remanded the case for a new trial. State v. Howard (Sept. 29, 1982), Warren App. No. 31. The case was again tried to a jury on July 5-7, 1983. The jury trial revealed the following facts (additional facts will be discussed as necessary under the relevant assignments of error):
At 3:00 a.m. on October 7, 1980, Allen Powell called his mother-in-law and talked to her for a few minutes. Powell was found dead at about 5:50 a.m. on the kitchen floor in appellant's apartment. Powell was covered in blood with a large amount of blood in the crotch area of his trousers. Ken Burns, a lieutenant with the Lebanon Police Department, testified that Powell was most likely in a sitting or crouched position at the time the majority of the blood drained down onto his trousers. There was an extensive amount of blood in a six-foot area in the kitchen, including on nearby walls, chairs, table, and dishwasher. In particular, there was a large amount of blood on the floor about three feet away from Powell, indicating he was once there before being moved to another location.
Towels and washcloths laying on the kitchen table and chairs were covered with blood. A pair of trousers, a tee shirt, a chair cushion, washcloths, and washrags, all wet, were found in a washing machine in the apartment. There were approximately six inches of pink-colored water in the bottom of the washing machine. A steak knife with blood on the handle was found in the kitchen sink. A knife blade was also found in the kitchen trash can. Its handle, however, was in the silverware drawer. A washcloth and an empty wallet with a picture of a child in it were also found in the bottom of the trash can. Other items recovered at the scene included a cigarette lighter, a prescription pill bottle, two or three wine bottles in the back of the apartment, and appellant's wallet with bloody money. Richard Jones, a police officer with the Lebanon Police Department who processed the crime scene, testified that the crime scene had been altered, that is, "[i]t looked as though they tried to clean the place up but weren't successful in doing so." Officer Jones testified, however, that the evidence was not hidden and was for the most part easily located.
Charles Hirsch, M.D., a pathologist who performed an autopsy on Powell, ruled that Powell died of a stab wound to the chest with a knife. The chest wound was approximately four and one-half inches deep, "perforated one of the rib cartilages," and "passed all the way through the heart from front to back." Dr. Hirsch testified that it took considerable force to thrust the knife into the victim. Dr. Hirsch also testified that the width of the blade which caused the fatal blow was consistent with a small kitchen knife. The autopsy also showed 36 superficial cuts on Powell's body, including defensive wounds. Dr. Hirsch stated it was unlikely that Powell either accidentally fell on the knife or self-inflicted the fatal wound.
By contrast to Powell, appellant only had an abrasion on his nose, an abrasion on his shoulder, and a small cut between two of his fingers. When apprehended, appellant was shirtless and barefoot, wearing only a pair of jeans. The jeans had blood spots as well as splatters and stains at the bottom. Appellant had dried blood on the sole of his feet.
On July 7, 1983, a jury found appellant guilty of murder. The trial court sentenced appellant to a term of 15 years to life in prison. A timely appeal was taken but subsequently dismissed as a result of appellate counsel's failure to timely file a brief. State v. Howard (Jan. 20, 1984), Warren App. No. CA83-07-048. On April 27, 2000, appellant filed a "motion for relief from judgment." By entry filed December 20, 2000, and pursuant to App.R. 26(B)(5), this court granted appellant's delayed application for reopening. On appeal, appellant raises four assignments of error.
Assignment of Error No. 1:
 THE TRIAL COURT ERRED BY ADMITTING INTO EVIDENCE THE STATEMENTS MADE BY APPELLANT WHILE HE WAS IN THE CUSTODY OF THE POLICE.
Rick Bens, a police officer with the Lebanon Police Department, was the first officer dispatched to the crime scene. Upon arriving at appellant's apartment at 5:50 a.m., Officer Bens observed appellant lying on his stomach and struggling with his brother inside the apartment. The officer subsequently helped another police officer handcuff appellant. Officer Bens testified that while he was being handcuffed, appellant was fighting and "hollering at everybody." According to Officer Bens, appellant then stated that "he was going to get back at his mother and brother. He was going to kill them. * * * [H]e could have gotten away if they hadn't held him." Because appellant was kicking and thrashing so much, Officer Bens and the other officer eventually handcuffed his ankles as well. After being handcuffed, appellant also stated that "he needed help for his friend[,] [that] he had broken the knife off in him, [and that] he couldn't find the knife[.]" Officer Bens testified that appellant kept asking for help for his friend in the kitchen. Officers Bens and Burns both testified that they never questioned appellant at the scene. Officer Bens also testified that nobody else was questioning appellant at the scene.
Appellant argues that his statements at the scene were admitted in violation of his constitutional rights because he was never advised of his Miranda rights. Appellant claims that his statements were made during the course of a custodial interrogation. The state agrees that appellant was in custody once he was handcuffed. The state argues, however, that appellant was not subject to an interrogation while in custody at the scene, and that therefore, Miranda warnings were not required.
The "prosecution may not use statements, whether exculpatory or inculpatory, stemming from a custodial interrogation unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona (1996),384 U.S. 436, 444, 86 S.Ct. 1602. Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. "The term `interrogation' under Miranda
refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis
(1980), 446 U.S. 291, 301, 100 S.Ct. 1682.
However, the Miranda rules do not prevent the use as evidence of every statement made by a person in custody. "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." Id. at 299-300. "`Interrogation' as conceptualized in theMiranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." Id.
Upon reviewing the record, we find that while appellant was in custody when he made his statements, he was never interrogated or questioned by any of the police officers present at the crime scene. There is no evidence that appellant was even addressed by the officers present at the crime scene. Appellant's statements were therefore not given in response to police questions. Rather, they were freely and voluntarily given at the same time that appellant was ranting and raving. As a result,Miranda warnings were not required and the statements were properly admitted at trial. Appellant's first assignment of error is overruled.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE THE PHOTOGRAPHS [sic] OF THE DECEDENT'S FAMILY.
An empty wallet with a picture of a child in it was recovered from a trash can in appellant's kitchen. Appellant's wallet with bloody money in it was recovered from appellant's person. At trial, Powell's mother-in-law testified that the picture found in the empty wallet was a picture of Powell's son. After the state rested, the trial court admitted the picture into evidence over the objection of defense counsel.
Appellant argues that the picture was admitted in violation of Evid.R. 403(A) which provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury." Appellant contends that the admission of the picture improperly and solely "serves to appeal to the passion of the jury and confuses the issues. Whether or not the decedent had children, or carried photographs of them with him, is completely irrelevant * * *."
It is well-established that the admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v.Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable.State v. Adams (1980), 62 Ohio St.2d 151, 157.
The wallet recovered in the trash can had no money. It appears from the record that it also had no means of identification such as a driver's license. By contrast, appellant's wallet, which was recovered from his person, had bloody money in it. The admission of the picture of Powell's son established that the empty wallet recovered from the trash can was Powell's wallet. The picture was therefore relevant and probative. Upon reviewing the record, we find that the probative value of the picture was not substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. We therefore find that the trial court properly admitted the picture of Powell's son into evidence. Appellant's second assignment of error is overruled.
Assignment of Error No. 3:
 THE TRIAL COURT ERRED IN ADMITTING INTO EVIDENCE THE PRIOR BAD ACTS OF APPELLANT.
Appellant argues that "the trial court allowed the admission of highly prejudicial evidence, including that Appellant had prior assaults and prior incarceration in prison" in violation of Evid.R. 404(B).
App.R. 16(A)(7) requires an appellant's brief to contain "the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies." Thus, an appellant must indicate to the appellate court specifically where the trial court's alleged errors may be located in the transcript. While appellant broadly argues that the trial court improperly admitted evidence of prior bad acts, he fails to cite to the portions of the record where the alleged errors may be found.
This court may disregard an assignment of error if a party fails to identify in the record the error on which the assignment of error is based as required by App.R. 16(A). App.R. 12(A)(2). "It is not the duty of an appellate court to search the record for evidence to support an appellant's argument as to any alleged error." State v. Watson (1998),126 Ohio App.3d 316, 321. "An appellate court is not a performing bear, required to dance to each and every tune played on an appeal." Id. Appellant's third assignment of error is accordingly overruled based upon App.R. 12(A)(2).
Assignment of Error No. 4:
 THE VERDICT OF THE JURY WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
In order for a court of appeals to reverse a trial court's judgment on the basis that a verdict is against the manifest weight of the evidence, the appellate court must unanimously disagree with the fact-finder's resolution of any conflicting testimony. State v. Thompkins,78 Ohio St.3d 380, 389, 1997-Ohio-52. The standard for reversal for manifest weight of evidence is as follows: "The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." Id. at 387. In making this analysis, the reviewing court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence. State v. DeHass
(1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
Appellant was charged with murder. To support a conviction of murder, the state must show that one "purposely cause[d] the death of another." R.C. 2903.02(A). One acts purposely "when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). The element of purpose "may be deduced from the attendant circumstances, the type of instrument used, the manner of its use, and its tendency to destroy life when used in that manner * * *." State v. Mayes (Nov. 19, 1987), Cuyahoga App. No. 53058, 1987 Ohio App. LEXIS 9671, at *3; see, also,State v. Stallings (1947), 82 Ohio App. 337.
While appellant generally argues that his murder conviction was against the manifest weight of the evidence, he more specifically argues that "the jury clearly lost its way finding that Appellant was not legally insane at the time of the alleged incident." Appellant claims that "[a]lthough the experts reached different conclusions with respect to the legal question of insanity, the evidence was clear that Appellant suffered from a severe mental disease or defect such that he did not know the wrongfulness of his actions or to conform his behavior to law."
A plea of not guilty by reason of insanity is an affirmative defense that must be proved by a preponderance of the evidence. State v. Brown
(1983), 5 Ohio St.3d 133, 134. A person is "`not guilty by reason of insanity' only if he proves * * * that at the time of the commission of the offense, he did not know, as a result of a severe mental disease or defect, the wrongfulness of his acts." R.C. 2901.01(N). "The weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of the facts." State v. Thomas (1982),70 Ohio St.2d 79, syllabus.
At trial, the defense presented the testimony of two psychiatrists, Glenn Weaver, M.D., and Bernard DeSilva, M.D. Dr. Weaver testified that he had examined appellant for about one hour on January 15, 1981. During the examination, appellant told Dr. Weaver that he had met Powell at Christ Hospital, in Cincinnati, Ohio (this was later confirmed by Dr. DeSilva), that on the day of the incident, he and Powell had been gambling, drinking, and using various drug preparations, that Powell struck him during a disagreement, and that he (appellant) subsequently lashed out at Powell and stabbed him before calling his mother. Appellant remembered an altercation with the police and being taken into custody, but did not remember anything after that.
Dr. Weaver testified that based upon appellant's medical records at Christ Hospital, a conversation with Dr. DeSilva on one or two occasions, the administration of a Minnesota Multiphasic Personality Inventory test, and appellant's social history, which included incarceration, hospitalization, and treatment for drug and alcohol abuse, appellant suffered from "schizophrenia * * * with transient psychotic episodes[.]" Dr. Weaver testified that appellant was psychotic at the time of the offense, and that as a result of his illness, appellant was not capable of either knowing the wrongfulness of his conduct or conforming his conduct to the law. Dr. Weaver testified that the offense was not a product of drugs and alcohol; rather, drug and alcohol abuse was a result of appellant's illness. Dr. Weaver also testified that appellant was still exhibiting signs of continuing psychiatric disorder when he examined him in January 1981.
Dr. DeSilva first saw appellant in his office in 1978 or 1979. At the time, appellant was severely depressed and having difficulty functioning because of drug and alcohol use. Dr. DeSilva diagnosed appellant as suffering from depressive reaction, schizo-affective disorder, and drug and alcohol abuse. Dr. DeSilva testified that he admitted appellant to Christ Hospital in September 1979, from February 20 to April 14, 1980, and in July 1980. Each time, Dr. DeSilva diagnosed appellant as suffering from depressive reaction and/or psychotic depression, and alcohol and/or drug abuse. However, notes taken by M. R. Vaghaiwalle, M.D., a resident physician at the time appellant was admitted to the hospital in July 1980, only diagnosed appellant with drug abuse. The notes stated that appellant had a long history of behavioral problems and drug abuse, including morphine, amphetamines, LSD, and Valium, underwent a detoxification program at the hospital, and used to drink heavily.
Appellant was admitted to the hospital twice in July 1980. He was first admitted from July 1 to 23, 1980. Several notes from different nurses during that period consistently indicated that on many occasions, appellant was pushing for medication and appeared to be sleeping when checked by a nurse. The notes also indicated when appellant was not pushing for extra medication. However, Dr. DeSilva discounted the nurses' notes as biased and not necessarily reliable.
Yet, upon appellant's discharge on July 23, 1980, Dr. DeSilva wrote in a dismissal summary that during appellant's hospitalization, "there was the possibility of some involvement in drug traffic in the hospital even though no evidence was found. It was felt that it may be wiser to discharge [appellant] in order to keep him from getting involved in this situation." The summary also states that upon appellant's admission, there was the "possibility of an overdose such that he took extra Inderal * * *. Has known drug abuse in the past and there was the possibility that he had injected Inderal intravenously in order to obtain a high or the possibility of attempted suicide could not be ruled out at this time. However patient denies suicide attempt." Appellant was admitted to Clermont County Hospital on July 27, 1980 with a stab wound to the abdomen allegedly self-inflicted. Appellant was subsequently admitted to Christ Hospital on August 4, 1980 where he stayed until he was discharged by Dr. DeSilva "with apprehension" on September 11, 1980. Dr. DeSilva saw appellant again on May 28, 1981 at the trial court's request. Dr. DeSilva testified that appellant could not really remember what had happened on the day of the incident.
Dr. DeSilva testified that based upon his treatment of appellant and appellant's medical records, appellant was suffering from depressive reaction and schizoaffective disorder at the time of the offense and was unable to understand what was going on. Dr. DeSilva testified that as a result, appellant was not capable of either knowing the wrongfulness of his conduct or conforming his conduct to the law. Dr. DeSilva admitted that appellant's actions on the day of the incident could have been caused by alcohol and drugs as appellant was "known to be violent when * * * drinking alcohol or using drugs." However, Dr. DeSilva believed that on that particular day, appellant's depression was a condition precedent to his actions. As Dr. DeSilva explained, appellant "had the depression at that time reasonably well under control, but it is aggravated by the alcohol and drug abuse, and from that point on, [appellant] did not have any control over himself." Dr. DeSilva testified that if appellant were to be incarcerated, he would be suicidal.
On rebuttal, the state presented the testimony of Eugene Dorsey, M.D., a psychiatrist. Dr. Dorsey testified that he had examined appellant twice, in December 1980 for an hour and a half, and in February 1981 for 45 to 60 minutes, and that he had reviewed appellant's history and a number of his medical records. Unlike Dr. Weaver, Dr. Dorsey did not contact Dr. DeSilva.
Dr. Dorsey testified that appellant's hospital record "indicate[d] two basic groups of conditions that were thought to be present by one or another doctor; that is, alcoholism and drug abuse, which were diagnosed by [two doctors] and at least part of the time by Dr. DeSilva. In addition, there was depressive reaction and schizoaffective disorder, which was diagnosed at least part of the time by Dr. DeSilva, but not by [the other two doctors]. * * * [T]he record reflects a very high probability of continued drug and alcohol abuse while he was in the hospital. The nurses' notes indicate a number of occasions in which he appeared to be intoxicated and/or smelled intoxicated and/or was found to have items in his possession that suggested the drug abuse. In reviewing the records, I could find no indication that he had regular urine drug screens * * * nor were there any regular blood alcohol tests done * * *."
Dr. Dorsey testified that appellant admitted heavy use of drugs and alcohol in the weeks prior to the offense, and in particular in the 24-hour period including the time of the offense. Yet, Officer Burns testified he did not see any needle marks on appellant and did not recall an odor of alcohol about appellant's person. Officer Jones testified he did not recover any needles from the crime scene. Officer Bens testified that while appellant may have been intoxicated for driving purposes, he was not so "for the circumstances surrounding the situation."
Dr. Dorsey also testified that appellant gave him three different versions as to what had happened on the day of the incident, did not recall having any psychotic symptoms that day, did not claim "hearing voices or seeing things that were not there," "knew that killing was wrong at that time and that he would not have killed except in self-defense[,]" and did not think he was crazy at the time of the offense or during his examination by Dr. Dorsey.
Dr. Dorsey testified that heavy substance intoxication will occasionally make people act as though they have mental illnesses, including schizophrenia. Dr. Dorsey explained that "[i]f you stop the drugs and alcohol and the person's mental disturbance is due to that cause, usually within a matter of a few days, a week or two, the individual is much, much better. If the person has schizophrenia and receives no treatment over a week or two or a month or two, usually the condition will persist or get worse."
Dr. Dorsey testified that when he examined appellant in February 1981, "[appellant] stated that he had been entirely drug free in the Warren County Jail * * *. He received no psychotropic medication in jail until the 7th of February, 1981, at which time he was started on a low dose of a tranquilizer * * * because of stomach complaints. He was not seen by a psychiatrist and did not receive psychiatric treatment between the date of his arrest and the date of [Dr. Dorsey's] interviews * * * with him. * * * He made no suicide attempts while in jail in Warren County. He did experience depression in jail * * *. * * * He was able to stick to the point pretty well during the interview and was vague really only when it came right down to what happened at the time of the offense. Then he did tell somewhat different versions of the same story[.]"
Dr. Dorsey testified that based upon his examination of appellant and appellant's medical records, appellant did not have a significant mental illness at the time of the offense, and that any mental impairment he may have had was due to voluntary self-induced intoxication. Dr. Dorsey also testified that appellant had "the mental capacity to distinguish right from wrong" at the time of the offense, and that "he was not incapable because of mental illness of adhering to the right at that time[.]" Dr. Dorsey noted that appellant had improved mentally while in jail for the offense, "with no psychiatric treatment and the only treatment being a forced abstinence from drugs and alcohol. * * * If he had, in fact, had schizophrenia with drug abuse, one would have expected him to improve a little bit, but not a whole lot and perhaps to worsen because of the stress of incarceration associated with no psychiatric treatment. Somebody who does a lot better with no treatment, except enforced abstinence, is very likely to have drug abuse as the sole or primary condition."
The record shows that the parties' respective expert witnesses reached conflicting conclusions as to whether appellant was suffering from a mental illness or was capable of knowing the wrongfulness of his conduct or conforming his conduct to the law at the time of the offense. However, it is well-established that when there is a conflict in the testimony on any subject, it is the responsibility of the trier of fact to settle the issue. Barnett v. Hills (App. 1947), 50 Ohio Law Abs. 208, 212. As the trier of fact in this case, the jury was free to accept or reject any or all of appellant's evidence relating to his alleged insanity. See State v. Curry (1989), 45 Ohio St.3d 109.
In light of all of the foregoing, and reviewing the record and weighing the evidence, we find that the jury did not lose its way or carry out a manifest miscarriage of justice by finding appellant guilty of murder and by rejecting his insanity defense. Appellant's fourth assignment of error is overruled.
Judgment affirmed.
POWELL and VALEN, JJ., concur.
[1] It is not clear from the record whether the victim's first name is spelled Allen or Alan. We choose to use the spelling used in the indictment and the state's bill of particulars, that is, Allen.